*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

V

BARIKA BUTLER-QUARLES,

    Defendant-Appellant.

UNPUBLISHED
June 23, 2026
9:51 AM

No. 370010
Wayne Circuit Court
LC No. 21-008799-01-FC

Before: YOUNG, P.J., and BORRELLO and TREBILCOCK, JJ.

PER CURIAM.

Barika Butler-Quarles appeals as of right her jury-trial convictions of assault with intent to cause great bodily harm (AWIGBH), MCL 750.84;[1] intentionally discharging a firearm in a building, MCL 750.234b; first-degree home invasion, MCL 750.110a(2); and three corresponding counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b, raising claims of ineffective assistance of counsel and several other claims of error in the trial court's orders. For the reasons provided below, we affirm.

## I. FACTUAL BACKGROUND

Jonathan Quarles was married to Butler-Quarles and they have three minor children together. They lived in a home in Grosse Pointe Park. Jonathan filed for divorce, which was finalized in February 2021, and moved out of the Grosse Pointe Park house in May 2021. Jonathan moved into a townhouse located on Woodward Avenue in Detroit. The home has a lower garage

---

[1] On this count, Butler-Quarles was charged with assault with intent to murder, MCL 750.83, but the jury convicted her of this lesser-included count of AWIGBH. Butler-Quarles also was charged with discharging a firearm in a building causing serious impairment of a body function, MCL 750.234b(4), and carrying a concealed weapon, MCL 750.227, but the trial court granted Butler-Quarles' motion for directed verdict on those counts.

level and two levels with living space above that. On the top floor, there is the master bedroom and bathroom.

After filing for divorce, Jonathan started a dating relationship with Naomi Long, who lived out of state. For their one-year anniversary, Long visited Jonathan, arriving on August 3, 2021. Long stayed at Jonathan's home. Their plan for August 4, 2021, was to go out to dinner with another couple and then see a concert in the city. Jonathan testified that he informed Butler-Quarles of his relationship with Long and of Long's upcoming visit.

Jonathan could not recall a time when Butler-Quarles was upset with him about his relationship with Long. Still, Butler-Quarles did not want Jonathan to introduce their children to Long, once saying something to the effect of, "that bitch better not meet our kids." A day or two before Long's arrival in Detroit, Butler-Quarles appeared late at night, standing outside Jonathan's garage door. She was crying and wanted to figure out a way for the two of them to get back together. Jonathan used the keypad on his garage door to open it, and the two went inside to talk for a few minutes. Jonathan expressed that he did not want to try to make it work, and Butler-Quarles eventually left on her own.

Leading up to Long's visit, there was evidence that Butler-Quarles had been depressed. Jonathan never had concerns that Butler-Quarles would harm someone else but did think she may harm herself. Jonathan found entries in Butler-Quarles' journal that showed she was considering harming herself.

On August 4, 2021, Long and Jonathan met with Jonathan's friends at a restaurant in Detroit. After ordering, but before any food arrived, Jonathan started to receive frantic text messages from Butler-Quarles indicating that their youngest daughter was experiencing seizures and had been admitted to the hospital. Jonathan tried to call Butler-Quarles, and when he eventually got through, Butler-Quarles said that she and the daughter were at Children's Hospital in Detroit. Jonathan replied that he was on his way.

Jonathan, accompanied by Long, drove toward Children's Hospital. While en route, Jonathan again talked with Butler-Quarles on the phone. He wanted to get more detail about where in the hospital they were, so he could go straight there upon arrival. Butler-Quarles told Jonathan that he better not bring "that bitch" to the hospital.[2] As Jonathan and Long were arriving at the hospital, Butler-Quarles told Jonathan not to worry about coming because she and the daughter were getting ready to be discharged. Jonathan thought this was highly unusual because only 10 or 12 minutes had passed since Butler-Quarles first told him that their daughter was at the hospital. Documents from Children's Hospital were admitted into evidence showing that the daughter was never admitted or discharged that day.

Jonathan and Long pulled arrived at the hospital and, seeing no reason to go inside, they proceeded with their plan to attend the concert. Jonathan had to use the bathroom, so he drove back to his house, which was not that far away. Upon arrival, Jonathan used the garage-door

---

[2] Jonathan testified that he never told Butler-Quarles that Long was in the car with him, but he did tell Butler-Quarles that Long was in town.

opener in his car to open the garage door. Jonathan and Long entered the home, and Jonathan used the bathroom on the main floor. Long, meanwhile, went to the second floor to use the bathroom there.

As she approached, Long noticed that the lights were on in the bathroom. Long got less than two steps into the room when she noticed, in the large mirror in front of her, the reflection of Butler-Quarles, who was crouching or squatting next to the toilet.[3] Butler-Quarles stood up and pointed a gun at Long, who heard a "pop." Long felt a sharp burn on the left side of her body. Long testified that she was "very close" to Butler-Quarles when she was shot.[4]

After being shot, Long stumbled back out of the bathroom, across a hallway and into a walk-in closet directly opposite the bathroom. While pointing the gun at Long, Butler-Quarles pursued and twice said, "[Y]ou're f**king with the wrong bitch." When Butler-Quarles got near Long, who was on the floor in the closet, Long grabbed at Butler-Quarles' hands and pulled Butler-Quarles toward herself, enabling Long to stand up. The two then struggled, with Long trying to keep the gun pointed away. The struggle led to the two of them into the bedroom. At that point, Jonathan entered the room, yelled at Butler-Quarles to stop, and tackled the two women. Butler-Quarles screamed at Jonathan, "Why don't you love me?" Jonathan was having some difficulty prying the gun from Butler-Quarles' fingers, so Long decided to punch her in the ribs to get her to release her grip. Jonathan was able to get the gun, eject the magazine, and toss both the magazine and gun across the room. Jonathan told Long to call 911, so she went downstairs to make the call. While Jonathan was pinning Butler-Quarles and waiting for police to arrive, Butler-Quarles kept repeating, "I can't believe you're with this bitch."[5]

Police arrived shortly thereafter, arrested Butler-Quarles, and put her in the back seat of a police car.[6] While there, she made statements to Lieutenant Myron Watkins that were captured on the car's video system. She was very concerned about the health, safety, and welfare of her children. As for the incident that took place inside the townhome, Butler-Quarles indicated that she came to the house to confront Jonathan verbally, which she admitted was "not a great idea." Jonathan, she alleged, had previously abused her, but she never reported it because she did not want to disrupt Jonathan's relationship with their children. Butler-Quarles also claimed that Jonathan attacked her again that day and she responded.

EMS personnel transported Long to a hospital. Medical personnel determined that one bullet struck Long, grazing her left wrist, entering and exiting her left bicep, and entering near her armpit and exiting out her back. At the scene, police found Butler-Quarles' cell phone on the floor

---

[3] Long testified that the person was not "on" the toilet but was crouching next to it.

[4] Long also relayed that her wound showed stippling, which, as she described, appears when a firearm is discharge from very close range.

[5] Jonathan further testified that Butler-Quarles stated, "I'm going to kill that bitch," but he was not sure if it occurred that day or another day.

[6] When police arrived, Butler-Quarles falsely claimed that Jonathan was her husband and that she had a personal protection order against him.

near the toilet, a spent shell casing on the floor of the bathroom, and a bullet lodged in the wall near the bathtub, approximately 3 to 4 feet off the ground. Police also found blood in the closet and on the right side of Butler-Quarles' dress.

Pursuant to a warrant, the police obtained cellular data from Verizon, which allowed them to approximate Butler-Quarles' whereabouts on August 4, 2021. On August 4, 2021, Butler-Quarles was utilizing a cell tower at Kercheval and Cadieu, near Grosse Point Park, at 6:18 p.m. and proceeded to move in a westerly direction toward downtown Detroit. Starting at 6:41 p.m., Butler-Quarles' phone pinged three different towers, all of which included Jonathan's home at 2554 Woodward in their coverage area. The last cellular activity on Butler-Quarles's phone occurred at 7:37 p.m.

The police discovered that Butler-Quarles purchased the retrieved gun the day before the incident. Ballistic testing confirmed that the retrieved bullet and expelled casing came from Butler-Quarles' gun.

At trial, Jonathan testified that Butler-Quarles did not have permission to be in the home. Not only did Butler-Quarles not have permission to enter the home as she pleased, but Jonathan also never gave her a key and never provided her with the code for the garage door. The video from Jonathan's Ring doorbell shows Butler-Quarles walking up to Jonathan's front door and knocking on it at 6:47 p.m. On the fifth day of trial, Butler-Quarles was voir dired, and she expressed that it was her desire to testify. However, on the next trial day, three days later, the defense rested, and Butler-Quarles did not testify. At the ensuing evidentiary hearing, it was learned that defense counsel and Butler-Quarles talked numerous times over the long weekend, with counsel advising her against testifying, and Butler-Quarles reluctantly agreeing.

Butler-Quarles was convicted and sentenced to 29 months to 10 years for AWIGBH, 36 months to 15 years for intentionally discharging a firearm in a building, and 57 months to 20 years for first-degree home invasion, all to run concurrently with two-year terms for each of three corresponding counts of felony firearm.

While Butler-Quarles' appeal of right was pending in this Court, she moved for a new trial or evidentiary hearing on the basis of ineffective assistance of counsel. Butler-Quarles first maintained that counsel was ineffective by failing to investigate her depression and her plan to commit suicide that day. This, in her view, would explain why she purchased the gun and had it on August 4, 2021. Butler-Quarles also argued that counsel was deficient by failing to have two of her friends testify. The first would have testified that because Butler-Quarles was "hanging on by a thread," she invited Butler-Quarles to meet her and some co-workers after work on August 4, 2021, at a restaurant on Woodward, near Jonathan's house. This meeting would have explained why Butler-Quarles was in the area of Jonathan's house. The second friend, meanwhile, would have shared that Butler-Quarles "had no plan to shoot Naomi Long, that the gun discharge was accidental, and that she had no knowledge Ms. Long had been wounded."

Butler-Quarles also argued that counsel failed to adequately investigate "the small confines of [the] bathroom." According to Butler-Quarles, it was physically impossible for the incident to have occurred as Long described because Butler-Quarles and Long "would literally have been in physical contact with each other, . . . leaving no room for Butler-Quarles to have raised an

outstretched arm with a pistol extending from her hand and aimed at Ms. Long's neck." Butler-Quarles further argued that her counsel's advice to forgo testifying was constitutionally deficient and that counsel inadequately investigated whether Butler-Quarles had permission to enter Jonathan's home. The trial court granted the motion for an evidentiary hearing.

At the hearing, defense counsel testified that it was not clear to him that Butler-Quarles was inside Jonathan's home to take her own life; instead, Butler-Quarles had vacillated on why she was inside the home. He also admitted that he knew Butler-Quarles had traveled downtown to meet her friend but that he learned from Butler-Quarles' prior counsel that the friend had indicated she thought she would not be a good witness. Further, trial counsel thought that the friend's last communication with Butler-Quarles was more harmful than helpful because it took place while Butler-Quarles was inside Jonathan's home.

Regarding the confines and layout of the bathroom, trial counsel testified that he did not see how an investigator would have been helpful. He also testified that the pictures of the bathroom that were admitted into evidence clearly showed the layout. As for the testimony of Butler-Quarles' second friend, from whom Butler-Quarles had learned Long had been shot, trial counsel explained that he thought such testimony was questionable given the significant amount of blood on Long's dress from the shooting. And with regard to Butler-Quarles possibly testifying, trial counsel stated that it was his recommendation that she not testify. Trial counsel explained that, although her testimony was necessary to get an instruction on accident, he thought all of the lies Butler-Quarles had told to the police would have been magnified on cross-examination, thereby doing more harm than good. Trial counsel noted that the lies to the police were only played one time to the jury, but if Butler-Quarles testified, they would have been repeated "over and over and over and over again," which could lead to a severe loss of credibility with the jury and maybe then she would have been found guilty of the more serious charge of assault with intent to murder (AWIM) instead of the lesser-included AWIGBH charge.

The trial court denied Butler-Quarles' request for a new trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Butler-Quarles first argues that her trial counsel was constitutionally ineffective for a variety of reasons. We disagree.

Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel. *Id.* The trial court's factual findings are reviewed for clear error, and its constitutional determinations are reviewed de novo. *Id.* A factual finding is clearly erroneous when the reviewing court is left with "a definite and firm conviction that a mistake has been made." *People v McElhaney*, 215 Mich App 269, 273; 545 NW2d 18 (1996).

Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been

different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). However, such performance must be measured without the benefit of hindsight. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

## A. EVIDENCE OF SUICIDAL THOUGHTS

Butler-Quarles first asserts that her trial counsel should have secured a forensic expert who would have testified regarding Butler-Quarles's psychological makeup leading up to and at the time of the shooting. According to Butler-Quarles, such an investigation would have revealed that Butler-Quarles had no intention of harming anyone but herself and that she purchased the handgun for that very specific purpose.

As an initial matter, there already was evidence of Butler-Quarles' depression and suicidal thoughts admitted at trial. Second, Butler-Quarles being depressed or even suicidal is not a defense, per se, to the charges. Butler-Quarles' depression arguably might explain why she initially purchased the handgun, but that reason for purchasing the gun fails to address why Butler-Quarles was inside Jonathan's home without his permission or why she, according to Long, was crouched between the toilet and half-wall in the bathroom and fired upon Long without any provocation.

In other words, the primary reason for the admission of Butler-Quarles' mental state purportedly was to show that she purchased the handgun to kill herself and not harm anyone else. But she did harm someone else, and without any provocation according to testimony. Consequently, assuming counsel's performance was deficient in this aspect, there simply is not a reasonable probability that the outcome of the trial would have been any different had defense counsel procured the psychological evidence Butler-Quarles urges on appeal.

Butler-Quarles is correct, though, that the trial court erred in part when it ruled that

the Defendant's psychological makeup is not a defense to any of the Defendant's convictions unless defense were claiming an insanity defense which is not at issue here. As such, any testimony by a mental health professional would not be relevant and admissible.

This Court previously held that, because Michigan does not allow a diminished-capacity defense, evidence of a defendant's mental limitations cannot be offered for that purpose, although such evidence may be admissible for some other, proper purpose. *People v Yost*, 278 Mich App 341, 355; 749 NW2d 753 (2008). Thus, to the extent the trial court's ruling is viewed as an absolute prohibition on the admissibly of psychological evidence, it sweeps too broadly. But importantly, Butler-Quarles does not identify a valid purpose for the evidence other than to suggest why the gun was initially purchased. Butler-Quarles attempts to generally aver that the evidence would have explained her "presence in the townhouse with a gun" and would have supported her theory "that the firearm discharge was an accident when the gun the Defendant had in her hand to shoot herself discharged accidentally." None of the proffered evidence would support these two theories. Further, depression and suicidal thoughts are neither a free pass for home invasion, nor evidence of accidental discharge of the firearm. Moreover, to the extent the trial court erred, that error was not dispositive. Notably, the court also ruled that, assuming that evidence of

Butler-Quarles' psychological makeup were admissible, no new trial was warranted because Butler-Quarles failed to prove there was a reasonable probability that the outcome of the trial would have been different. For the reasons stated above, we agree.

## B. FAILURE TO CALL PARTICULAR WITNESSES

Butler-Quarles next argues that trial counsel's performance was deficient because he failed to investigate and call two friends as witnesses. Trial counsel admitted that he knew that one friend and Butler-Quarles had arranged to meet that evening at a restaurant only a couple of blocks away from Jonathan's home. While this piece of information may have explained why Butler-Quarles was downtown, it does nothing to contradict or explain why Butler-Quarles knocked on Jonathan's front door, ended up inside Jonathan's home, and ambushed Long. Accordingly, assuming there was any error, there is not a reasonable probability of a different outcome had this friend testified.

Moreover, trial counsel explained that, although it would have been a positive to establish that Butler-Quarles had planned to meet a friend at a nearby restaurant, he "didn't see how those positives outweigh the potential negatives" that could arise from text messages exchanged between the two in which the friend advised Butler-Quarles to leave Jonathan's house. Trial counsel not calling Farrow is trial strategy, "and an appellate court does not substitute its judgment for that of counsel in matters of trial strategy." *People v Seals*, 285 Mich App 1, 21; 776 NW2d 314 (2009).

For similar reasons, trial counsel was not ineffective by failing to call her other friend as a witness. In an affidavit, this other friend averred that when she visited Butler-Quarles in jail, Butler-Quarles was shocked to learn that Long had been shot. Trial counsel did speak with and even planned to call this friend as a witness but ultimately did not. He stated that he did not think the testimony would have been that helpful because messages exchanged between the two could have been viewed by the jury as exhibiting a romantic relationship, affecting his credibility. Trial counsel also was not sure how the jury would view the claim that Butler-Quarles was unaware that anyone had been shot when, according to him, blood was found on Butler-Quarles' dress. Again, trial counsel's decision not to call this second friend as a witness is a matter of trial strategy that we are not permitted to second-guess on appeal. *Id*. Moreover, assuming that counsel's performance was deficient, there is not a reasonable probability that the outcome would have been different with this additional testimony because of the overwhelming amount of other evidence showing that she broke into the home and intentionally fired the gun at Long.

In sum, counsel was not ineffective for not calling Butler-Quarles' friends as witnesses.

## C. FAILURE TO ENGAGE INVESTIGATOR

Butler-Quarles next asserts that her trial counsel was ineffective by failing to engage an expert or investigator related to the layout of the bathroom. This argument is wanting. Butler-Quarles does not explain why this decision fell below an objective standard of reasonableness or meaningfully expound upon why an expert or investigator was necessary. See *People v Solloway*, 316 Mich App 174, 190; 891 NW2d 255 (2016) (concluding that because Solloway failed to explain what the missing expert testimony was and how it would have assisted his case, he had not demonstrated defense counsel performed unreasonably.)

Even if this Court were to agree with the underlying assumption that having actual measurements would have been helpful, neither the affidavit of the investigator, whom Butler-Quarles hired in support of her motion for a new trial, nor the investigator's sketch, supports her assertion. The investigator merely averred that "the two individuals [Butler-Quarles and Long] would have been able to reach out and touch each other." But the fact that Long and Butler-Quarles were in close proximity was never disputed. Notably, the expert never opined that the layout of the room lent itself to a physical struggle during which the firearm could have been discharged. The dimensions provide and the expert confirms that there is enough room for one person to be on one side of the half-wall while another person is on the opposite side. Simply put, there is no record support that counsel was ineffective for failing to call an expert on the dimension of the bathroom. *Id.*

### D. ADVICE TO HAVE BUTLER-QUARLES NOT TESTIFY

Butler-Quarles contends that her trial counsel was ineffective when he advised her not to testify at trial. Butler-Quarles suggests that the advice was constitutionally deficient because it was "formed without adequate investigation of key fact and expert witnesses." Presumably relying on the previously discussed failures to investigate and call witnesses, Butler-Quarles argues that those witnesses "would have supported her defense that she had no plan to ambush Naomi Long, and that the firearm she had to shoot herself discharged by accident." However, as already discussed, none of Butler-Quarles' evidence supports either of those propositions. Instead, trial counsel explained that the primary basis for his recommendation that Butler-Quarles not testify is that Butler-Quarles' history of lying in this case would be brought to the forefront by the prosecutor on cross-examination:

> So one of her statements in the back of the vehicle, coupled with her statements in the house, I mean, these are just—I mean, in trying to prepare her to testify I'm trying to ask myself what would be a good explanation for lying to the police when they first respond about why you're in the house, lying to the police about whether or not you're still married to this person?

> I mean, to me what would be a good explanation for those things? So if I'm not able to get any type of confidence about what's a good explanation for that how do I confidently put you in front of a jury to try to explain that and then I asked myself, is there actually a good explanation that can be provided or in the alternative are you just going to look like a liar in front of the jury and to me, yes, they got to see the body cam, yes, they got to hear the statements.

> They were played one time, but if you put your client on the stand and false statements are being made to the police you have an opportunity on cross-examination to ask that witness about lying over and over and over and over again which if you lose the jury from a credibility prospective [sic][,] I don't know how you rebuild that, at least in my experience.

Trial counsel went even further and opined that, in his experience,[7] if Butler-Quarles testified, she likely would have been convicted of the more serious AWIM charge instead of the lesser-included AWIGBH charge.

After our review of the police videos, it is sufficiently clear that counsel's recommendation was part of a viable trial strategy. It was reasonable to conclude that Butler-Quarles presenting an entirely different defense at trial than the one she repeated in the videos—i.e., that she bought the gun to protect herself against Jonathan's abusive behavior, she only was in the home to verbally confront Jonathan, and that her (unspecified) actions were justified because Jonathan attacked her—had a high chance of being seriously questioned by the jury. "A difference of opinion as to trial strategy does not amount to ineffective assistance of counsel." *People v Armstrong*, 124 Mich App 766, 769; 335 NW2d 687 (1983)

And notably, the basis for Butler-Quarles' claim of error—that counsel's decision to recommend that she not testify was premised on a failure to adequately investigate and call other witnesses—is not borne out by the record. Defense counsel was concerned about Butler-Quarles' prior false statements, and that concern was valid.

## III. JURY INSTRUCTION

Butler-Quarles next argues that the trial court erred when it denied her request for a jury instruction on accident. We disagree.

"The determination regarding whether a jury instruction is applicable to the facts of a case is reviewed for an abuse of discretion; however, questions of law relative to jury instructions are reviewed de novo." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). A court abuses its discretion when it selects an outcome falling outside the range of reasonable and principled outcomes. *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017).

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022). "The trial court is required to instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021) (brackets omitted). "The jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories *that are supported by the evidence*." *Id*. at 37-38 (quotation marks and citation omitted; emphasis added).

Butler-Quarles requested M Crim JI 7.3a,[8] which provides the following:

The defendant says that [he/she] is not guilty of [state crime] because [he/she] did not intend to [state specific intent required]. The defendant says that [his/her] conduct was accidental. If the defendant did not intend to [state specific

---

[7] Trial counsel testified that he had been practicing criminal law for 12 years and had conducted at least 400 trials.

[8] Defense counsel cited "7.3" in his request, but the actual instruction on accident is "7.3a."

intent required], [he/she] is not guilty. The prosecutor must prove beyond a reasonable doubt that the defendant intended to [state specific intent required].

In this instance, there was no evidence of accident. Review of the record includes only Long's testimony that Butler-Quarles stood up from a crouched position behind the bathroom half-wall and fired a gun at her. The forensic evidence supported this version of events. Long further described Butler-Quarles following her to the walk-in closet after the shot was fired with her gun raised and pointed at Long the whole time, with Butler-Quarles stating that Long had "messed with the wrong bitch." This does not support the accident instruction, and the court did not abuse its discretion by not giving that instruction.

Butler-Quarles also asserts that the failure to provide this instruction denied her of the right to present a defense. However, she never asserted this constitutional claim in the trial court. Therefore, the constitutional aspect of her claim of error is not preserved. See *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012) (stating that a defendant must raise an issue in the trial court to preserve it for appellate review). Unpreserved issues, both constitutional and nonconstitutional, are reviewed for plain error affecting defendant's substantial rights. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). Because the evidence did not support an instruction under established rules of evidence and procedure, Butler-Quarles has failed to establish any constitutional error, let alone a clear or obvious violation.

IV. REQUEST FOR TRANSCRIPT

Butler-Quarles also argues that she is entitled to a new trial because the trial court improperly informed the jury that it was not possible to produce a requested transcript. We disagree.

Generally, "[t]his Court reviews decisions regarding the rereading of testimony for an abuse of discretion." *People v Davis*, 216 Mich App 47, 56; 549 NW2d 1 (1996). MCR 2.513(P) provides as follows:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence that has not been allowed into the jury room under subrule (O), the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may make a video or audio recording of witness testimony, or prepare an immediate transcript of such testimony, and such tape or transcript, or other testimony or evidence, may be made available to the jury for its consideration. The court may order the jury to deliberate further without the requested review, as long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

Thus, a defendant "does not have a right to have a jury rehear testimony. Rather, the decision whether to allow the jury to rehear testimony is discretionary and rests with the trial

court." *People v Carter*, 462 Mich 206, 218; 612 NW2d 144 (2000).[9] The trial court's denial of a jury's request to review testimony does not violate MCR 2.513(P) so long as the trial court does not "foreclose the possibility of the jury obtaining transcripts in the future." *People v McDonald*, 293 Mich App 292, 297; 811 NW2d 507 (2011).

Sometime after the jury entered deliberations, it sent a request to the trial court for a copy of Long's transcript. The court, without the parties present, informed the jury of the following:

> The parties are not here, but I have spoken to the attorneys from both sides and they agree that I could answer these questions of our jury without them being present.
>
> So the first request was a copy of [Long's] testimony transcript and unfortunately although we do take a record of everything that occurs here[,] it's not something where we can just push a button and print it. It's something that we would typically request and then the reporters would have either seven days on an expedited matter or twenty-eight days to prepare that. So unfortunately we cannot provide that and we just have to ask that you use your collective memory to the best of your ability.

Butler-Quarles asserts that the trial court's response violates MCR 2.513(P) because it foreclosed the opportunity to obtain the transcript in the future when it instructed the jury that "unfortunately we cannot provide that." Read in its entirety the trial court initially told the jury the transcript could be obtained under certain circumstances but that there were time delays associated. But ultimately, the trial court concluded "we cannot provide that and we just have to ask that you use your collective memory," seemingly foreclosing the possibility that the jury could renew their request.

Nevertheless, this claim of error still fails. Because Butler-Quarles made no objection to the trial court's response at trial, she forfeited this claim of error. MCR 2.512(C); *People v Gonzalez*, 256 Mich App 212, 221-222; 663 NW2d 499 (2003), disapproved in part on other grounds 469 Mich 967 (2003). "A forfeited, nonconstitutional error may not be considered by an appellate court unless the error was plain and it affected defendant's substantial rights." *People v Gonzalez*, 468 Mich 636, 643; 664 NW2d 159 (2003). To establish plain error, defendant bears the burden of showing that: 1) an error occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected her substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). And to demonstrate that an error affected her substantial rights, defendant must show that she suffered "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Butler-Quarles cannot show how this error affected the outcome of the proceedings. If anything, less access to Long's testimony helped Butler-Quarles because Long's

---

[9] The Michigan Court Rule at issue in *Carter* was MCR 6.414(H). *Carter*, 462 Mich at 208, 210-211. Subsection MCR 6.414(H) was subsequently renumbered to MCR 6.414(J), though the language of the subsection remained the same. This court rule was then repealed and replaced by MCR 2.513(P). MCR 6.414(J); MCR 2.513(P). The relevant language remains substantively the same.

testimony was so damning. There is no reason to think that the jury would have reached a different outcome if they had been given the printed transcript of Long's testimony.

## V. PROSECUTORIAL MISCONDUCT

Butler-Quarles also argues that she is entitled to a new trial because of unpreserved instances of prosecutorial misconduct. Specifically, Butler-Quarles argues that she was denied a fair trial when the prosecutor (1) repeatedly argued that Butler-Quarles lied to Jonathan and the police about the illness of their daughter, (2) repeatedly argued that cell tower data placed Butler-Quarles inside Jonathan's house that night, (3) argued that Butler-Quarles attempted to shoot Long a second time but only failed because of a fortuitous gun jam, (4) stated, with no evidentiary support, that science cannot accurately predict the path of a bullet when trying to justify the low position of the bullet found in the bathroom wall, (5) averred, again without evidentiary support, that the minimal amount of blood in the closet was within the norm for gunshot wounds, and (6) improperly bolstered the credibility of Long. Unpreserved issues are reviewed for plain error affecting defendant's substantial rights. *Hanks*, 276 Mich App at 92. Butler-Quarles fails to meet this burden.

As to the first claim of error, that "[the prosecutor] used repeated arguments that Butler-Quarles lied to Jonathan Quarles about the illness of their daughter and to the police in emotional exchanges to bolster the credibility of key witness Naomi Long," we note that the prosecutor's comments were supported by the evidence. Jonathan testified that he later obtained records from the hospital that proved his daughter was never there on the night-in-question, and those records were submitted to the jury.

Regarding the cell tower data, Butler-Quarles cites the following passages from the prosecutor's arguments:

> In fact, if you compare the timing of the messages or phone calls, excuse me, to Jonathan that evening according to her certified call detail record[,] the first calls that are made to him that night start at 7:07 while she's in the Defendant's— while she's in Jonathan Quarles's house.

> She's in his house when she is making those calls to him. She is in his house when she's sending those text messages to him. She's in that house with that gun planning, planning to kill [Long], planning to kill [Long] so that she can have Jonathan to herself, planning to kill [Long] so that he wouldn't be happy anymore.

> * * *

> She's in that house as she's making these phone calls in and out to Jonathan and other people and you can see the duration of the calls.

Butler-Quarles is correct that the cell tower data expert specifically explained that the data does not allow one to pinpoint a phone's location within the utilized sector. But that Butler-Quarles was in his home making calls is a reasonable inference from both the cellphone tower data and the fact that she was found within Jonathan's home and arrested on that scene that

evening. *People v Christel*, 449 Mich 578, 599-600; 537 NW2d 194 (1995). The prosecutor's argument was permissible.

Next, Butler- Quarles takes exception to the prosecutor's suggestion that Butler-Quarles attempted to shoot Long a second time but only failed to do so because the gun jammed. This was error because, put simply, there was no evidence that the gun was ever jammed. The prosecutor's suggestion is error[10]—as opposed to misconduct—because the record indicates that the argument was premised on a misunderstanding of the evidence. Although other evidence clearly established that the magazine had been separated from the retrieved firearm, Katelyn Hom, a forensic technician, noted that there still was one live round in the gun's chamber. Hom explained that with this type of firearm, when a shot is fired, if there is ammunition in the magazine, the gun will automatically reload a new live round into the chamber. The next day, the prosecutor asked a firearm and toolmark expert, Chantal Fay, the following questions:

> *Q*. Do you know how a bullet would be *lodged* in the chamber of a firearm such as that one? Are there some reasons how or why a bullet could get *lodged* in the chamber?
>
> *A*. Are you referencing a bullet or a cartridge?
>
> *Q*. A cartridge. Thank you for correcting me.
>
> *A*. No problem.
>
> So a reason a cartridge may not be proper could be several reasons. One, the firearm might be dirty. . . .
>
> Another could be user error. One common way user error occurs is during an event called limp resting [sic: wristing]. So if a person does not put enough force and have enough of a good grip on the firearm while it's firing[,] it's going to actually prevent the proper rearward movement of the slide. So as the fired cartridge case is trying to extract and eject[,] it may not fully extract and eject[,] and it may not also chamber the [next] round fully. [Emphasis added.]

Although we cannot be certain, the prosecutor may have been using the terms "lodged" and "loaded" interchangeably during this exchange. Fay, on the other hand, viewed the term "lodged" as describing some type of mechanical failure, i.e., a jam. Thus, when Fay started talking about a cartridge being jammed, the prosecutor may have (erroneously) thought that Fay was describing the situation with this particular firearm.

This sort of testimony, that Butler-Quarles wanted to shoot multiple times, gets at relevant elements of the offense, such as intent. However, we conclude that the prosecutor's comment is

---

[10] *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015) (stating that a technical or inadvertent error at trial is better presented as a claim of "prosecutorial error" as opposed to "prosecutorial misconduct").

not so egregious that a timely instruction would not have cured any prejudice.[11] *People v Dobek*, 274 Mich App 58, 68; 732 NW2d 546 (2007) (concluding that reversal is not warranted where the prejudicial effect of improper prosecutorial commentary could have been cured by timely instruction). We further note that defense counsel was able during his closing argument to heavily rely on this unsupported assertion to put the prosecutor in a negative light:

> One of the most important things that Madam Prosecutor focused in on is that this firearm was in a jammed condition when the police responded. What witness said that? And, see, this is what I'm talking about and I'm glad that she'll have an opportunity to get back up here and I hope that she'll apologize because no witness said that, not a single one . . . .

> * * *

> But what happens at trial proceedings when you don't like the testimony and you don't like the evidence? You stand up here in front of a jury and you start making things up. That's not the only example, right.

Because Butler-Quarles was ultimately convicted of the lesser assault offense, not assault with intent to murder, the jury may have rightfully disbelieved the prosecutor's false and unsupported assertions.

We reach a similar conclusion with respect to Butler-Quarles' next challenge. One of defense counsel's primary arguments in support of an accidental firing was that because the retrieved bullet was found only three feet above the floor,[12] it made no sense that the shooting occurred as Long had described, i.e., with Butler-Quarles shooting across the half-wall toward Long's neck or chest area. Counsel maintained that if that were the case, then the bullet would have been much higher on the wall. During rebuttal, the prosecutor stated,

> [w]ell, members of the jury, can any of us predict the path of a bullet after it's gone through a human body? You cannot predict that, nor can science predict it, but what you have is the testimony of [Long] . . . .

There was no scientific evidence or expert testimony at trial showing that science "cannot predict" the path of a bullet after passing through a human body. But common sense dictates that predicting the path of a bullet that (1) grazes a body, (2) enters and exits a different body part, and (3) enters and exits yet another part of the body would be exceedingly difficult, if not impossible. In any event, to the extent the prosecutor's comment was inappropriate, a timely instruction would have cured any prejudice and though one was not given (because Butler-Quarles did not request

---

[11] Although there was no contemporaneous instruction, the jury later was instructed that the attorneys' comments and arguments were not evidence.

[12] Although the testimony was that the bullet was 3 to 4 feet above the floor, defense counsel focused exclusively on the lower end of that estimate.

-14-

one), the jury did hear that the parties' arguments are not evidence, precluding Butler-Quarles any relief. *Id*.

Butler-Quarles also challenges the prosecutor's comment during rebuttal that a human body does not necessarily "gush blood everywhere" after it is shot. This comment, again, was in response to defense counsel's focus on the fact that no blood was documented in the bathroom. Although there was no expert testimony on this topic, the evidence nonetheless supports the prosecution's rebuttal. The evidence clearly established that Long had been shot that day. Even ignoring Long's testimony on where the shooting took place, there is no dispute that the bullet was retrieved from the bathroom wall and the spent casing was found in the bathroom. The natural inference is that, given the layout of the bathroom, Long was shot while inside the bathroom. Yet, with no signs of blood in the bathroom, one could logically infer that a body does not necessarily "gush blood everywhere" after being shot. The prosecutor also did not merely give this conclusion with no reasoning; she explained that Long's clothing would act to initially absorb any blood before it became saturated. This is a reasonable argument that was based on the evidence. Moreover, to the extent there was any error, (1) a timely instruction would have cured any prejudice and (2) it was a permissible response to Butler-Quarles' argument. *Id*.

Lastly, Butler-Quarles contends that the prosecutor improperly bolstered the credibility of Long. "[T]he prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995); see also *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). "A prosecutor may, however, argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief." *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997); see also *Thomas*, 260 Mich App at 455 (stating that a prosecutor can argue that a witness is credible, especially when the question of guilt "depends on which witnesses the jury believes"). Butler-Quarles takes exception to the prosecutor describing Long as the "most consistent person in this trial" and contrasting that characterization with defendant telling "[l]ies upon lies upon lies." The pertinent passage is as follows:

When [the officer asks defendant], is anyone in the house, [defendant] goes, well I don't know. . . . Lies upon lies upon lies. Think about all that when you go back in there and given everything that—I'm not telling you to rely on what I said.

I'm trying to point out to you what the witnesses have said, how it matches the evidence that we have on this case. The most consistent person in this trial is [Long] and remember, members of the jury, she was the one shot that day and no one else.

Generally, "[p]rosecutors are accorded great latitude regarding their arguments and conduct." *Bahoda*, 448 Mich at 282 (quotation marks and citations omitted; alteration in original). When reviewing closing arguments for prosecutorial misconduct, this Court must examine the prosecutor's remarks in context to determine if the defendant received a fair trial. *Id*. at 266-267. Prosecutors are "free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *Id*. at 282 (quotation marks and citation omitted; alteration in original). "Included in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to

the effect that he has some special knowledge concerning a witness'[s] truthfulness." *Id*. at 276. Furthermore, "[j]urors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

At first blush, the prosecutor's comment does appear to be vouching for the witness. However, upon reviewing the record, it also appears to be a fair summary of the evidence. In the police car video, Butler-Quarles told a version of events that the record did not support; she told police officers she suffered violence at the hands of Jonathan and responded to his attack. Long, on the other hand, was consistent in her own statements and her testimony was consistent with the evidence provided by Jonathan and the police officers. Therefore, Butler-Quarles has not established the presence of any plain or obvious error related to this vouching claim.

Affirmed.

/s/ Adrienne N. Young
/s/ Stephen L. Borrello
/s/ Christopher M. Trebilcock